INVESTMENT FUNDS CORPORATION
et al., Appellants,

v.

Thomas BOMAR, Trustee of Kitimat Corporation, Appellee.

No. 19006.

United States Court of Appeals
Fifth Circuit.

May 30, 1962.

John J. Intravia, Fort Lauderdale, Fla. (Intravia & Wyman, Fort Lauderdale, Fla., of counsel), for appellants.

Thomas B. DeWolf, Miami, Fla., C. Shelby Dale, Fort Lauderdale, Fla., Helliwell, Melrose & DeWolf, Miami, Fla., for appellee, Thomas J. Bomar, trustee.

Before TUTTLE, Chief Judge, and JONES and GEWIN, Circuit Judges.

TUTTLE, Chief Judge.

The District Court appointed a Special Master to hear the claims which were asserted by the appellants against the appellee, the trustee in bankruptcy of the Kitimat Corporation. The claims were based on certain loans which had been made by the appellants to the bankrupt in 1958. The Special Master denied the claims on the ground that the loans were usurious under the applicable Florida law and were therefore not recoverable against the trustee by virtue of the provisions in section 70, sub. c of the Bankruptcy Act.[1] The District Court approved the Special Master's report.

The appellants' prime contention is that the Special Master erred in concluding that the loans were usurious under Florida law. We agree with the appellants.

The basic facts underlying this litigation are not contested. They are as follows: Samuel W. Poore, the central figure in this dispute, came to Fort Lauderdale, Florida from Toledo, Ohio in the summer of 1957. He was soon introduced to Joseph Hamilton, the president of the bankrupt, Kitimat Corporation. Kitimat was then engaged in the construction of an apartment project in the Fort Lauderdale area known as the "Four Seasons Apartments".

Hamilton told Poore that he was interested in securing financing for the Four Seasons project, and it was agreed that Poore would attempt to obtain such financing for Kitimat. Poore then took out a license as an independent mortgage broker, and he was soon successful in securing a large loan for Kitimat from the Mastan Corporation. This loan was to bear interest at the rate of 15% per annum, and Poore was to receive a 10% commission from Kitimat for his services in securing the loan.

Thereafter, Hamilton and Poore had numerous discussions relating to Kitimat's need for further financing of its operations. Hamilton indicated that he did not want to be tied up with any long term obligations, and he felt that short term loans would be more attractive to potential investors. Poore and Hamilton agreed that the best way to obtain such short term financing would be to set up a corporation through which the funds could be channeled to Kitimat. Poore was to secure investors for Kitimat. When this was done, Kitimat was to execute a note and mortgage in favor of the corporation. The corporation would then assign the note and mortgage pro rata to the individual investors. In this way, Poore would find it easier to secure investors to replace those who decided not to renew their short term loans, since these new investors would share pro rata in the security given to the corporation and the security would maintain its priority of record as against any subsequent encumbrances on the same property. Both Poore and Hamilton felt that this would be the most satisfactory way of obtaining a steady flow of short term funds for Kitimat.

In accordance with this plan, Poore was able to interest the appellants Ray Powers and H. E. Gillig and one Dale Teaford, all apparently acquaintances of his, in making a $100,000 short term loan to Kitimat. Powers agreed to supply $70,000, Gillig $5,000, and Teaford the remaining $25,000. Thereafter, and on March 27, 1958, Poore organized the appellant Investment Funds Corporation

---

1. Section 70, sub. c of the Bankruptcy Act [11 U.S.C.A. § 110, sub. c] provides, in pertinent part, that "The trustee may have the benefit of all defenses available to the bankrupt as against third persons, including statutes of limitation, statutes of frauds, *usury*, and other personal defenses; * * *" (Emphasis supplied).

under the laws of Florida, and he became the president of this corporation. The next day, Powers and Gillig made out their checks to Poore, who immediately endorsed them over to Kitimat, while Teaford's check for $25,000 was made out directly to Kitimat. None of the funds actually passed through the Investment Funds Corporation. Kitimat then gave its note for $100,000 and a mortgage on the Four Seasons Apartments project to Investment Funds. The mortgage was duly recorded. Immediately thereafter, Investment Funds executed "partial assignments" of the note and mortgage to Powers, Gillig and Teaford.

The loan was to run for 13 days and was to bear interest at the rate of 15% per annum. The interest was to be paid to Investment Funds, but was to be turned over immediately to the individual investors. Investment Funds was to retain only enough of the interest payments to cover its actual costs, but never more than 10% of the interest paid. In connection with this transaction, Hamilton agreed to pay Poore a 5% commission, or $5,000. Poore was also to receive a 1% commission for every monthly extension of the loans which he could secure from the original investors. The record does not show that the individual investors knew of the commissions to be paid to Poore, and it is clear that neither they nor Investment Funds were to receive any part of the commissions.

In April, 1958, Poore induced Powers to lend Kitimat another $10,000, and he procured a $30,000 loan from Mrs. Tea-

ford. These loans were secured by a mortgage on another piece of property owned by Kitimat, and they were handled in the same manner as the original loans. Poore was to get a 5% commission plus a 1% commission for extensions.

In May, 1958, the appellant Hoover Supply Company purchased a 20% interest in the $100,000 note and mortgage from Powers. In November, 1958, the appellant Intravia purchased the entire interest in the $40,000 note and mortgage from Powers and Mrs. Teaford.

In June, 1959, Kitimat filed a petition for reorganization under Chapter X of the Bankruptcy Act. The appellee, Bomar, was appointed trustee. At the time of filing of the petition, Kitimat had not repaid any of the principal of the aforesaid loans and was in default on the payment of interest. Investment Funds and the individual appellants filed their proofs of claim which, as indicated above, were rejected by the Special Master.

The Special Master concluded (1) that the loans in question were made by Investment Funds; (2) that Poore was the agent of the lender Investment Funds; (3) that Poore's commissions, when added to the legal 15% rate of interest[2] charged on the loans, resulted in there having been made an interest charge in excess of 25% on the loans;[3] and (4) that the transactions thus came within the purview of section 687.07 of the Florida Statutes, F.S.A. whereby any lender who charges or accepts 25% interest for a loan forfeits both the principal and interest to the borrower.[4]

2. Under Florida law, the rate of interest which can legally be charged to a corporation is 15% per annum. Florida Statutes, § 687.02, F.S.A.

3. The Special Master found that Poore's 5% commission on the $100,000 transaction represented an interest "charge of 175% per annum", and that his 5% commission on the $40,000 transaction represented "a charge of about 30% per annum". The Special Master also found that "the charge of 1% per month for granting extensions of these loans amount [ed] to 12% per annum, which, when add-

ed to the 15% per annum interest charged," represented charges of 27% per annum on the loans.

4. Section 687.07 of the Florida Statutes, F.S.A. provides as follows:

"Any person, or the agent, officer or other representative of any person, lending money in this state who shall willfully and knowingly charge or accept any sum of money greater than the sum of money loaned, and an additional sum of money equal to twenty-five per cent per annum upon the principal sum loaned, by any contract, contrivance or device whatever,

The law which we believe controls this decision is set out in the Florida case of Shaffran v. Holness, Fla.App., 102 So.2d 35, at page 40. It is there stated that:

"* * * 'even though an agent may act for the lender in other matters, or in some respect in connection with the loan in question, yet if it is clear that *in procuring the loan* he was acting as the agent of the borrower, it has generally been held that a commission paid him * * * will not constitute usury.'" (Emphasis added).

In our view, the undisputed evidence in the record demonstrates overwhelmingly (1) that the lenders in this case were the individual investors rather than the Investment Funds Corporation and (2) that Poore acted as the agent of Kitimat, and not as the agent of the lenders, in procuring the loans in question.

Investment Funds was conceived, organized and operated primarily for the benefit of Kitimat. It was recognized by all as a mere "dummy", whose only function was to act as the nominal payee of interest and mortgage of record. Investment Funds was not in the business of lending money; it had no funds to lend. The money sought to be forfeited here was never the property of Investment Funds. As noted above, some of the checks of the individual investors were made out to Poore individually, who immediately endorsed them over to Kitimat, while others were made out directly to Kitimat. Under these circumstances, it is difficult to see how it can be said that Investment Funds was the lender in these transactions. Only the most artificial and technical reasoning would support the view taken by the Special Master here. We are not willing to blind ourselves to the realities where the drastic remedy of forfeiture is involved.

Moreover, while it is clear that Poore, as president of Investment Funds, was acting as the agent of the individual investors in certain respects, it is equally clear that he was not acting as their agent *in procuring the loans and extensions* in question. Poore, as president of Investment Funds, the nominal payee of interest on the loans, was of course obliged to account to the individual investors for the interest payments. In this respect he was their agent. But, as noted previously, the Florida courts have consistently held that the mere fact of agency is not enough to require the conclusion that commissions received by the agent constitute usury if, taken alone or added to the interest charged on the loans, they total more than the legal rate of interest. To constitute usury, it must be demonstrated that the agent acted on behalf of the lender in *procuring the loans*. It is this vital distinction which the Special Master completely overlooked in reaching his decision.

As indicated above, Poore was originally hired by Kitimat in 1957 to secure financing for the Four Seasons project being constructed by Kitimat. He was successful in procuring a large loan from the Mastan Corporation, and he was paid a commission of 10% for his services in this regard. Poore and Hamilton then had various conversations relating to Kitimat's need for further financing. Poore was authorized to line up additional investors and to offer a mortgage on the Four Seasons project as security for any loans he might procure. He then approached the individual appellants and persuaded them to make loans to Kitimat. There is nothing to indicate that Poore had such control over these in-

directly or indirectly, by way of commissions, discount, exchange, interest, pretended sale of any article, assignment of salary or wages, * * * or for forbearing to enforce the collection of such moneys or otherwise, shall forfeit the entire sum, both principal and interest, to the party charged such usurious interest, and shall be deemed guilty of a misdemeanor, and on conviction, be fined not more than one hundred dollars, or be imprisoned in the county jail not more than ninety days."

dividuals as would have enabled him to compel their making the loans. Rather, as the agent of Kitimat to procure loans, he exercised the usual skills of a mortgage broker in persuading these individuals of the wisdom of investing in Kitimat's operations. He exercised the same role in persuading the individual investors to grant monthly extensions on the loans. It was for these services and these services alone that Poore was rewarded by Kitimat.

It is significant that Poore was referred to in Kitimat's books as a "mortgage broker" and that his commission checks were made out to him as a "mortgage broker". Kitimat's own attorney in these dealings testified that Poore was a mortgage broker for Kitimat. Finally, as late as January, 1959, Poore was given exclusive authority by Kitimat to secure financing for another of its construction projects.

■ The Florida usury laws seek to protect a borrower from having to pay more than the legal rate for a loan. They are not designed to protect him from having to pay the legal rate for a loan plus a commission to a third party who persuades the lender to make the loan. In the latter case, the borrower pays for two things. First, he pays for the services of the third party, and second, for the loan itself. Where, however, the commission is paid to a party who is the agent of the lender *and who can control the actions of the lender*, it is not true that the borrower is paying for two distinct things. Since the agent, in such a case, need not persuade another to make the loan, but can himself make that decision, he has not performed any services for the borrower apart from the actual making of the loan. In that event, the commission paid to the agent is *for the loan itself*, and the amount of the commission can justly be added to the interest charged to determine whether the usury laws have been violated.

■ In the instant case, it is clear that Poore could not control the actions of the individual investors and that the commissions paid him were for actual services rendered to Kitimat in persuading these investors to make the loans in question and to grant monthly extensions thereof. This being so, it follows that the amount of commissions paid or payable to Poore should not have been added to the amount of interest charged on the loans in determining whether the loans were usurious.

The findings of the Special Master were clearly erroneous and should not have been approved by the District Court. The judgment of the District Court is therefore Reversed and the cause Remanded for further proceedings consistent with the views expressed in this opinion.